***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner and the briefs and arguments of the parties. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives, except for modifications regarding the compensability of plaintiff's fall of August 28, 2001.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which the parties entered into as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The Commission has jurisdiction over the parties and the subject matter.
3. An employer-employee relationship existed between plaintiff and defendant-employer at the time of plaintiff's alleged injury, and Continental Casualty Insurance Company was the carrier on the risk at the time of plaintiff's alleged injury.
4. The following exhibits were stipulated into evidence by both parties.
a. Stipulated Exhibit 3: Letter explaining payroll information.
b. Stipulated Exhibit 5: Medical Records.
c. Defendants' Exhibit 4: Home Depot payroll information.
d. Defendants' Exhibit 5: Home Depot time records.
e. Defendants' Exhibit 6: Home Depot time and payroll information.
f. Defendants' Exhibit 7: Kroger time records (2002).
g. Defendants' Exhibit 8: Kroger time records (2001).
h. Plaintiff's Exhibit 9: Department of Labor materials.
5. The depositions of Dr. Lyman S.W. Smith, Denise R. Van Amburgh and Jeanine Alston have been submitted and received into evidence.
 *********** EVIDENTIARY RULING
At the hearing before the deputy commissioner, plaintiff requested leave to depose a witness from the North Carolina Department of Labor pertaining to an investigation into the safety of the employer's work place, but plaintiff's motion was denied at that time. Nevertheless, plaintiff scheduled the deposition of Jeanine Alston. Defendants objected to the deposition. The Full Commission has reviewed the transcript of Ms. Alston's deposition for purposes of ruling on the objection. Under the circumstances, defendants' objection is OVERRULED.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. On June 9, 2001 plaintiff was employed by defendant-employer as a deli and bakery manager. During the 52 weeks ending June 9, 2001, plaintiff was continuously employed by defendant-employer and earned $33,366.55. Plaintiff's average weekly wages on June 9, 2001, were $641.66.
2. On June 9, 2001 plaintiff was walking down a hallway in the office area of a store operated by defendant-employer when she tripped over an extension cord and fell, landing on her right side. There were no eyewitnesses to the fall, but plaintiff did call out as she was falling and a number of employees observed plaintiff on the floor.
3. Defendants denied plaintiff's claim and have raised a number of facts in support of the denial. Plaintiff has requested that defendants be sanctioned for denying the claim, therefore, those facts are outlined herein.
4. First, the circumstances surrounding the fall raised questions as to the accuracy of plaintiff's account of how the fall occurred. In this regard, witnesses testified that there was a noticeable delay between the time plaintiff called out and the time she ended up on the floor. Measurements were taken which showed that plaintiff ended up at least nine feet away from the extension cord over which she claimed to have tripped. Witnesses testified that the cord was taut and that a fan attached to the cord would have fallen over if any force had been applied to the cord. But after the fall, the fan was not disturbed and the cord was still taut. In addition, even though the floor where the incident occurred typically vibrates somewhat if someone is walking in a brisk manner, witnesses that were near the area of the incident did not notice the floor vibrate when the incident occurred. Finally, plaintiff fell against a half-wall where some plastic mail slots had been placed. The mail slots were not fixed securely to the wall and had been known to fall off the wall with even a slight disturbance, but none of the mail slots were out of place after the incident occurred.
5. Secondly, plaintiff's physical injuries raised questions as to the accuracy of plaintiff's account. In this regard, plaintiff testified that her right elbow was bleeding after the fall and that James Allen, one of the co-workers in the area, was present when she cleaned up the blood from her arm using some paper towels. However, Mr. Allen did not remember ever seeing any blood on plaintiff's arm and at least two other co-workers testified that they looked and did not see any blood on plaintiff's arm.
6. Plaintiff declined the need for any medical attention on June 9, 2001, and even completed her shift on that date. When plaintiff first sought medical attention, on June 11, 2001, she was observed to have bruised her sacrum even though she reportedly fell on her right side. In addition, plaintiff was observed as having a scrape on her right arm on June 11, 2001.
7. Although the foregoing facts do provide a reasonable basis for questioning plaintiff's account of her fall, nevertheless, the Full Commission finds plaintiff's history of having fallen in the hallway at work on June 9, 2001, to be credible.
8. As a result of her fall at work on June 9, 2001, plaintiff sustained the following injuries: contusions in the area of her right shoulder, sacrum and right knee, a lumbar strain and an abrasion of her right elbow. Over time, the contusions, the lumbar strain and the elbow abrasion all resolved, but plaintiff did continue to report symptoms involving her right knee and shoulder for which plaintiff sought treatment from Dr. Lyman Smith, an orthopedic surgeon.
9. Dr. Smith determined that plaintiff's ongoing problems with her right shoulder were the result of bursitis, which was caused by the fall on June 9, 2001, and that plaintiff's ongoing problems with the right knee were due to an arthritic condition, which had been exacerbated during the fall of June 9, 2001.
10. On June 11, 2001, plaintiff first sought medical treatment for her injury. At that time, plaintiff was instructed to return to work with no strenuous activity of her right arm, no use of her right arm above shoulder level and a lifting restriction of one to two pounds. Plaintiff began a course of physical therapy June 11, 2001.
11. On June 20, 2001, plaintiff's restrictions were changed to no squatting or repetitive bending and no lifting, pushing or pulling with the right arm involving more than two to three pounds. Plaintiff was also given a restriction against overhead lifting with her right arm.
12. After the fall on June 9, 2001, plaintiff first returned to work on June 21, 2001, where she continued to work at diminished wages through July 18, 2001.
13. On June 25, 2001, plaintiff was seen at Raleigh Orthopedic Clinic, where she was given a restriction for light work in a sedentary position with no lifting of more than ten pounds and no bending or stooping and limited stair climbing.
14. On June 27, 2001, plaintiff returned to Concentra Medical Center, where she was given restrictions of no lifting, pushing and pulling more than two pounds, no standing or walking for more than an hour, no squatting or kneeling and no reaching above her shoulders.
15. Prior to her injury of June 9, 2001, plaintiff had taken a second job with Home Depot. Plaintiff did not return to work for Home Depot after her injury by accident of June 9, 2001 until July 4, 2001. Plaintiff continued to work for Home Depot through July 18, 2001.
16. On July 4, 2001, plaintiff was seen working at Home Depot as a cashier by Carol June Wolfe, produce manager at Kroger, and she did not appear to be having any difficulty completing her duties.
17. On July 18, 2001, plaintiff returned to Raleigh Orthopedic Clinic, at which time she saw Dr. Smith. Dr. Smith excused plaintiff from work until August 22, 2001, and recommended that plaintiff participate in additional physical therapy for her right shoulder and knee. On July 30, 2001, plaintiff did begin a course of additional physical therapy at the recommendation of Dr. Smith. Thereafter, plaintiff participated in physical therapy for her shoulder and knee on August 7, 9, 14, 17, 22 and 27, 2001. On August 22, 2001, plaintiff was seen by Dr. Smith, who recommended that she obtain an MRI scan of her right knee to rule out internal derangement. At the time, Dr. Smith commented that if the MRI were normal, he anticipated getting plaintiff back to work.
18. On August 28, 2001, plaintiff fell down some stairs at home resulting in a right ankle contusion, tibial spine fractures in her left knee, tears of the lateral meniscus and medial meniscus in her left knee, and exacerbation of a pre-existing arthritic condition involving plaintiff's right clavicle.
19. Plaintiff testified that on August 28, 2001, her right knee had given way, causing her to fall down the steps at her home. Plaintiff also indicated that her right knee had been giving way prior to August 28, 2001.
20. Plaintiff was diagnosed with a degenerative knee condition by Dr. Smith. Dr. Smith testified that plaintiff's injured right knee was the cause of her fall at home on August 28, 2001. The fall on August 28, 2001 was a natural consequence of plaintiff's compensable right knee injury.
21. Following plaintiff's fall at home on August 28, 2001, she came under the care of Dr. Jeffrey Kobs, an orthopedic surgeon, for treatment of injuries sustained in that fall. As of the time of the fall on August 28, 2001, plaintiff was unable to work in any employment due to the injuries she sustained in that fall. Dr. Smith continued to treat plaintiff for her right knee condition after August 28, 2001, even though Dr. Kobs was treating plaintiff's other injuries.
22. The MRI of plaintiff's right knee was finally performed on November 30, 2001. The MRI demonstrated arthritic changes in the knee, but was otherwise normal.
23. When plaintiff returned to Dr. Smith on January 24, 2002, he recommended that she return to work at three to four hours per day and increase her work activities to full-time work over the next three weeks. At the time, Dr. Smith discharged plaintiff from his care to return on an as-needed basis.
24. As a result of the fall on June 9, 2001, plaintiff was not able to work in the same or any other employment from June 10, 2001, through June 20, 2001, and from July 19, 2001, through January 24, 2002.
25. As a result of plaintiff's injuries of June 9, 2001, plaintiff's capacity to earn wages was reduced to $367.90 per week from June 21, 2001 through July 18, 2001.
26. At the time Dr. Smith released plaintiff to return to work on January 24, 2002, plaintiff's base rate of pay with defendant-employer was $12.40 per hour. Based upon that hourly rate and a minimum of three hours per day, five days per week, plaintiff had the capacity to earn at least $186.00 per week on January 24, 2002.
27. Plaintiff did return to work for defendant-employer on February 5, 2002, but never returned to full-time work. Specifically, plaintiff worked for four days beginning February 5, 2002, during which time she earned $155.00. Plaintiff acknowledged that she had been offered work as a cashier by defendant-employer but plaintiff declined that offer because she did not believe it was within her restrictions, even though the only restriction which had been placed on her returning to work by Dr. Smith was that of a gradual return to full-time work.
28. As a result of plaintiff's injuries of June 9, 2001, plaintiff's capacity to earn wages was reduced to no less than $186.00 per week from January 25, 2002, for a maximum of three weeks, through February 13, 2002.
29. On February 21, 2002, plaintiff consulted Dr. Suzanne Zorn, who thought that plaintiff's right shoulder bursitis had resolved but noted that plaintiff was continuing to complain of her right knee and of the injuries she sustained as a result of the fall at home on August 28, 2001. Dr. Zorn wrote plaintiff out of work for one month but did not indicate whether plaintiff's incapacity for work was a result of her right knee injury, her other conditions or some combination thereof.
30. Plaintiff returned to Dr. Zorn on March 21, 2002, at which point Dr. Zorn again wrote plaintiff out of work for another month, again without specifying which of plaintiff's conditions were causing her incapacity for work.
31. At the hearing, plaintiff testified that she planned to have additional surgery in April of 2002, and Dr. Smith's deposition reflected that plaintiff had made arrangements with Dr. Kobs for arthroscopic surgery on her left knee on April 1, 2002. However, the record contains no indication that the surgery was ever performed.
32. With the exception of the exacerbation of plaintiff's pre-existing arthritic condition involving her right knee, all of the injuries that plaintiff sustained as a result of her fall of June 9, 2001, have resolved. Plaintiff has not yet reached maximum medical improvement as a result of the June 9, 2001, exacerbation of her pre-existing arthritic condition in her right knee.
33. The North Carolina Department of Labor conducted an investigation into the circumstances of plaintiff's fall on June 9, 2001. As a result of that investigation, defendant-employer was cited for violations of federal regulations associated with the use of the extension cord. The Full Commission finds that plaintiff's injury was caused by the willful failure of defendant-employer to comply with a statutory requirement.
34. There were substantial questions of both law and fact and therefore the defense of this matter was reasonable.
 ***********
Based upon the foregoing Stipulations and Findings of Facts, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained injuries by accident arising out of and in the course of her employment with defendant-employer on June 9, 2001. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's subsequent fall at home on August 28, 2001 as the result of her degenerative knee condition is the direct and natural result of plaintiff's June 9, 2001 injury by accident. N.C. Gen. Stat. § 97-2(6);Horne v. Universal Leaf Tobacco Processors, 119 N.C. App. 682,459 S.E.2d 797, disc. rev. denied, 342 N.C. 192, 463 S.E.2d 237 (1995).
3. Plaintiff is entitled to have defendants provide all medical treatment arising out of her compensable injury by accident of June 9, 2001 and the injuries that resulted from the August 28, 2001 fall at home to the extent it tends to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25, 97-25.1.
4. As a result of the injury she sustained on June 9, 2001, plaintiff is entitled to temporary total compensation at the rate of $427.77 per week from June 10, 2001, through June 20, 2001, and from July 19, 2001, through January 24, 2002. N.C. Gen. Stat. § 97-29.
5. As a result of the right knee injury she sustained on June 9, 2001, plaintiff is entitled to compensation for temporary partial disability from June 21, 2001, through July 18, 2001, at the rate of $182.51 per week and from January 25, 2002, through February 14, 2002, at the rate of $303.77 per week. The issue of plaintiff's entitlement to future benefits regarding her wage earning capacity after February 14, 2002, the date of hearing before the deputy commissioner, is reserved because this evidence was not presented before this panel. N.C Gen. Stat. § 97-30.
6. Pursuant to N.C. Gen. Stat. § 97-12, Plaintiff is entitled to a 10% increase in compensation for willful failure of defendant-employer to comply with a statutory requirement reprimand by OSHA.
7. There were substantial questions of law and fact and the defense of this claim was reasonable, therefore, plaintiff is not entitled to the imposition of sanctions for the defense of this claim. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing Findings of Facts and Conclusions of Law, the undersigned enters the following:
 AWARD
1. Defendants shall pay plaintiff compensation for temporary total disability at the rate of $427.77 per week from June 10, 2001, through June 20, 2001, and from July 19, 2001, through January 24, 2002, for a total of 28 5/7 weeks.
2. Defendants shall pay plaintiff compensation for temporary partial disability at the rate of $182.51 per week from June 21, 2001, through July 18, 2001.
3. Defendants shall pay plaintiff compensation for temporary partial disability at the rate of $303.77 per week from January 25, 2002, through February 14, 2002, for a total of 3 weeks.
4. Defendants shall pay for medical compensation incurred by plaintiff as a result of the injuries she sustained when she fell at work on June 9, 2001 and the subsequent fall of August 28, 2001.
5. Plaintiff's request pursuant to N.C. Gen. Stat. § 97-12, for a 10% increase in compensation is hereby GRANTED.
6. Plaintiff's request for costs, including attorney's fees, pursuant to N.C. Gen. Stat. § 97-88.1 is hereby DENIED.
7. Since plaintiff has not yet reached maximum medical improvement with regard to the right knee injury she sustained on June 9, 2001, the issue of compensation under N.C. Gen. Stat. § 97-31 is hereby DEFERRED until after plaintiff reaches maximum medical improvement.
8. A reasonable attorney's fee in the amount of 25% of the compensation due plaintiff under the terms of this award is hereby approved for plaintiff's counsel. Defendants shall deduct said amount from the sum due plaintiff and shall send it directly to plaintiff's counsel.
9. Defendants shall pay the costs.
This the 18th day of November 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER